Little Bay v. US Commerce          CV-00-007-M    05/16/02

UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


Little Bay Lobster Co.; Amy
Philbrick, L.L.C.; Carol Coles,
L.L.C.; Eulah McGrath, L.L.C.;
Jennifer Anne, L.L.C.; Jacqueline
Robin, L.L.C.; Michele Jeanne,
L.L.C.; and Amy Michele, L.L.C.,
     Plaintiffs

     v.                                    Civil No. 00-007-M
                                           Opinion No. 2002 DNH 096
Honorable Donald L. Evans, in
his capacity as United States
Secretary of Commerce,
     Defendant


                         **O R D E R**


     This declaratory judgment action poses a single question:

did the United States Department of Commerce ("DOC") lawfully

adopt regulations establishing a new boundary line between two

lobster management areas in federal waters off the coasts of

Massachusetts, New Hampshire and Maine?  See 50 C.F.R. §§

697.18(a) and (d).  Plaintiffs assert that the regulation is

unlawful because, in adopting it, DOC violated: (1) 5 U.S.C. §§

701 et seq. (the Administrative Procedure Act or "APA"); (2) 16

U.S.C. §§ 5101 et seq. (the Atlantic Coastal Fisheries

Cooperative Management Act or "ACFCMA"); and (3) 5 U.S.C. §§ 603

and 604 (the Regulatory Flexibility Act or "RFA"). Before the court are: (1) plaintiffs' motion for summary judgment (document no. 18), to which defendant objects, and (2) defendant's cross-motion for summary judgment (document no. 21), to which plaintiffs have filed no objection.

**Summary Judgment Standard**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)). When resolving cross-motions for summary judgment, the court "makes rulings of law – rulings concerning whether, once all reasonable inferences are drawn against granting summary judgment, there exists any 'genuine issue of material fact' as to which a trial is warranted."

Continental Grain Co. v. Puerto Rico Maritime Shipping Auth., 972

F.2d 426, 429 (1st Cir. 1992) (emphasis in the original)

(citations omitted).

> Not every factual dispute is sufficient to thwart
> summary judgment; the contested fact must be "material"
> and the dispute over it must be "genuine."  In this
> regard, "material" means that a contested fact has the
> potential to change the outcome of the suit under the
> governing law if the dispute over it is resolved
> favorably to the nonmovant.  By like token, "genuine"
> means that the evidence about the fact is such that a
> reasonable jury could resolve the point in favor of the
> nonmoving party.

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001)

(quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315

(1st Cir. 1995)).

## Factual Background

The challenged regulation, 50 C.F.R. § 697.18, establishes a

set of eight lobster management areas.[1]  Plaintiffs seek a

declaration that defendant's adoption of a new boundary line

---

[1] The regulation was not adopted in a vacuum; it was part of a comprehensive lobster management plan, codified at 50 C.F.R. §§ 697.1 through 697.26.  The eight lobster management areas delineated in § 697.18 consist of six numbered areas (Area One through Area Six), plus the Area Two/Three Overlap and the EEZ Nearshore Outer Cape Lobster Management Area.

between "EEZ Nearshore Management Area 1," § 697.18(a), and "EEZ Offshore Management Area 3," § 697.18(d)[2] was unlawful. Prior to the adoption of § 697.18, the boundary between Area One and Area Three was located approximately thirty miles offshore. The new boundary is located approximately fifty miles offshore. Thus, to take advantage of higher trap limits allowed in Area Three, lobster boats must now travel approximately twenty miles further offshore than they had to under the old regulation. Plaintiff Little Bay Lobster Company ("Little Bay") is a wholesale and retail lobster dealer located in Newington, New Hampshire. The remaining plaintiffs are business entities that own and operate steel lobster boats, each of which exceeds 72 feet in length. These plaintiffs all fish in Area Three, from the port of Portsmouth, New Hampshire.

---

[2] "EEZ" is an abbreviation for Exclusive Economic Zone, which is an area of coastal waters subject to federal regulation and located between 3 and 200 nautical miles from the shore. See Ace Lobster Co. v. Evans, 165 F. Supp. 2d 148, 152 n.3 (D.R.I. 2001) (granting summary judgment to defendant (the Secretary of Commerce) in case challenging 50 C.F.R. § 697.19, which imposes trap limits on lobster fishermen based upon the management areas in which they fish). "The waters within 3 nautical miles from the shore are generally protected by the states," id. (citations omitted), while beyond the EEZ lie international waters.

The statutory and regulatory background of federal management of the American lobster fishery, and the history and status of lobster management off the New England coast, are fully discussed in Ace Lobster, 165 F. Supp. 2d at 154-62.  Because the decision in Ace Lobster appears to have been based upon an identical administrative record, and presents the relevant background information in considerable detail, those interested in a detailed history of lobster management in New England are referred to Ace Lobster.  The following discussion is limited to the specific history of the regulation at issue in this case.

The idea of establishing lobster management areas within the EEZ appears to have originated in a December 22, 1993, draft version of Amendment #5 to the American Lobster Fishery Management Plan ("FMP").[3]  (Administrative Record (hereinafter "R.") at 287, 307-10.)  Among other things, and as part of a "stock rebuilding program" (R. at 307), Amendment #5 proposed the creation of four lobster management areas, and called for specific management strategies for each area to be devised by

---

[3] The FMP, and its amendments, were prepared by the New England Fishery Management Council ("NEFMC" or "the Council"), which was organized and operating under authority of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1802 et seq.

that area's Effort Management Team ("EMT") (R. at 310-13).  One portion of Amendment #5, pertaining to minimum carapace length, was adopted in May 1994, in a rule promulgated by the National Marine Fisheries Service ("NMFS") of the National Oceanic and Atmospheric Administration.  (R. at 542-43 (59 Fed. Reg. 26,454-55 (May 20, 1994), codified at 50 C.F.R. § 649.20).)  The remaining provisions of Amendment #5, including the establishment of the four lobster management areas[4] and the requirement that EMTs devise specific management strategies for their management areas, were adopted in rules promulgated approximately one month later.  (See R. at 551, 563-64.)[5]  Of particular significance to this case, the rules adopted in 1994 established a boundary – sometimes called the "Dick Allen Line" – between lobster management Areas One and Three.  That line is located approximately thirty miles from shore.

---

[4] In the absence of any suggestion to the contrary, the court assumes that the lobster management areas delineated in the draft version of Amendment #5 are the same as those codified in 50 C.F.R. § 649.42(b).

[5] 59 Fed. Reg. 31,938, 31,950-51 (June 21, 1994) (codified at 50 C.F.R. § 649.42(b)).  Amendment #5, as codified at 59 Fed. Reg. 31,938 et seq., was subsequently withdrawn.  (See R. at 2323 (64 Fed. Reg. at 68,229 (Dec. 6, 1999)) ("this rule removes the lobster regulations currently codified at 50 CFR part 649 and replaces them with regulations codified at 50 CFR part 697").

At some point, either before Amendment #5 was drafted, during the process of its adoption, or after its codification at 50 C.F.R. § 649, the Council engaged in some kind of "collaborative process involving input from all affected fishermen" (Pls.' Mem. Supp. Mot. Summ. J. at 8; see also Pls.' Statement of Undisputed Facts ¶ 6) that considered, among other things, the boundary line between lobster management Areas One and Three.  (The alleged lack of a similar "collaborative process" during the drafting and adoption of the current lobster management area boundaries, codified at 50 C.F.R. § 697.18, lies at the heart of Count I.)

Plaintiffs' Memorandum of Law suggests that the collaboration took place before the drafting of Amendment #5, which itself defines a boundary between Areas One and Three (see id. ("the boundary lines proposed in Amendment 5 . . . were developed through a collaborative process . . .")), while Plaintiffs' Statement of Undisputed Facts suggests that the collaboration took place after the promulgation of Amendment #5 in the Code of Federal Regulations (see Pls.' Statement of Undisputed Facts ¶ 6).  According to the Statement of Facts,

7

the EMT's [created by Amendment #5] had numerous
meetings and discussions regarding the boundary line
between Area 1 and Area 3.  As a result of these
discussions, a consensus was reached between the EMT's
and representatives of the lobster fishery which
proposed a boundary between Area 1 and Area 3.  The
recommendations of the EMT's were never adopted by the
New England Fishery Management Council.

(Id.)  Because the timing of the collaborative consensus-building

meetings discussed by plaintiffs is not a material fact, for

reasons explained below, it need not be resolved.


Substantively, plaintiffs characterize the collaborative

process in the following way:

the process to create that line [the boundary line
between Areas One and Three] took many months and many
meetings.  The line ultimately adopted has been called
the "Dick Allen Line".  Mr. Allen is a lobsterman and
has been actively involved in the regulatory process
for [a] number of years.  He was actively involved in
the meetings that took place between the various
industry representatives in order to establish this
line.  The line that the EMT's used and was adopted in
Amendment 5 came about based upon his suggestions for
compromise after numerous meetings.

(Pls.' Mem. Supp. Mot. Summ. J. at 8.)

Before the Council had a chance to submit management measures to NMFS (presumably based upon the work of the EMTs), as required by 50 C.F.R. § 649.42(a)(1)-(2) (see R. at 563), the Magnuson Fishery Conservation and Management Act was substantially amended by the Sustainable Fisheries Act of 1996. See Ace Lobster, 165 F. Supp. 2d at 154-55. The Magnuson Fishery Conservation and Management Act was given a new name by the amendment; it is now known as the Magnuson-Stevens Act ("MSA"). Id. at 154. In response to certain requirements of the MSA, and in recognition that "the majority of the lobster fishery occurred in state waters which was beyond the regulatory authority of the New England Fishery Management Council" (Pl.'s Statement of Undisputed Facts ¶ 7), NMFS transferred regulatory authority for lobster management from the MSA (and, therefore, from NEFMC) to the Atlantic Coast Fisheries Cooperative Management Act, 16 U.S.C. § 5101 et seq. (and, consequently, to the Atlantic States Marine Fisheries Commission ("ASMFC" or "the Commission"). See Ace Lobster, 165 F. Supp. 2d at 157.

At issue here is the Commission's new lobster management plan (codified at 50 C.F.R. § 697), which replaced the old plan,

9

based upon Amendment #5 of the FMP, that had been developed by the Council (and codified at 50 C.F.R. § 649). The new lobster management plan started out as Amendment #3 to the Commission's Interstate Fisheries Management Plan ("ISFMP") for lobster. While the record contains no evidence of any collaborative consensus-building meetings such as those that took place in the context of establishing the Dick Allen Line, "in the summer of 1997, the [ASMFC] conducted a series of public hearings to accept public comments on the Draft Amendment 3 to the ISFMP." (Pls.' Statement of Undisputed Facts ¶ 9.) In the draft discussed at those meetings – which, inexplicably, was included in the appendix to plaintiffs' memorandum of law, but appears not to have been included in the administrative record – "the boundary line between the proposed Area 1 and Area 3 was the same boundary line that had been developed by the EMT's." (Id.) As well, the draft states, on page fourteen:

> For management purposes, the management unit is further divided into the following six areas described below (figure 1; also see Appendix 3 for a listing of coordinates). These areas are subject to change and the Board is seeking public input on the number of areas and their specific boundaries.

(Pls.' App. to Mem. Supp. Mot. Summ. J.) Finally,

10

> [n]umerous public hearings were conducted on the East Coast to review the content of Draft Amendment 3. Subsequent to the conclusion of these hearings, the Lobster Management Board, a committee of the [ASMFC] voted to move the boundary further out to sea [by twenty miles] thereby enlarging Area 1 at the expense of Area 3.  A.R. at 5425.

(Pls.' Statement of Undisputed Facts ¶ 10.)

The meeting at which the Commission's Lobster Management Board ("the Lobster Board") voted to alter Amendment #3 to the ISFMP by shifting the boundary between lobster management Areas One and Three from thirty to fifty miles from shore took place on September 29 and 30, 1997.  At that meeting, the following exchange took place:

> MS. GOLDTHWAIT:  Thank you, Mr. Chairman.  I think it is important to note that there is a rationale [for moving the boundary between Areas One and Three] – at the Maine hearings, we were hearing that the line be moved out further than where it appears on our map, and that had to do with bottom features and an attempt to encompass entirely within the line, certain edges and their surrounding [topography] that composed a habitat in and of itself rather than keeping the line where it is now, which tends, as I understand it, to split a habitat.
> So the effort is to get it from thirty out to at least fifty to fifty-five, because that would encompass certain general habitat areas.

11

CHAIRMAN DAVID BORDEN:  Robin?

MS. ALDEN:  More on that, I agree with Jill [Goldthwait] about what she said, and furthermore we heard testimony from fishermen who fished in the offshore fishery, who are concerned about the distribution of the V-notch and over maximum sized lobsters that are actually moving around in the Gulf, in the deep water Gulf of Maine.

We had testimony at the hearing, which the summary couldn't possibly do justice to.  I was not at that hearing, but I did, as a request of the fishermen, sit down and talk with them for about 45 minutes the day before the hearing.

His position was that the way the Gulf of Maine operates is to a certain [extent] as a unit, is that he has [made] his living catching the lobsters which the State of Maine fishermen have been throwing overboard.

He felt that if we were serious about what we were doing, that protection should go as far as the deep water before it starts traveling up onto [Georges Bank].

The other thing that is clear both from the Nutrall's surveys and from the testimony of hearing is that the lobsters in the area east of Penobscot Bay, in the deep water, clearly are a different – there are more large egg bearing lobsters in that area than there are in the rest of the deep waters of the Gulf of Maine.  For protection in that deep water, eastern part of the State, is very important for the egg production that is coming out of that area.

(R. at 4967-68.)  The hearing continued, in relevant part:

MR. ANDERSON:  I am Bill Anderson a fisherman from Colter Maine, and I guess I attended the public hearings and when they said that they were looking for other comments about these lines, I look at these lines as to lines where you separate fishermen.  You can draw lines to separate scallopers from the lobstermen, or

12

separate offshore Lobstermen from inshore Lobstermen, and the type of gear they use, in these certain areas, that these lines, the lobsters on the bottom know nothing about a line that you and I draw in this room.

So, my proposal is, is that we treat the Gulf of Maine, as a lobster stock as a whole.  I have been working with researchers.  I have been fishing for 30 years.  I have been working with researchers for at least 20 years through the University of Maine.  We have done tagging studies.  I have tagged oversized lobsters.

. . .

We did a V-notch tagging study about 10 or 15 years ago.  All of this stuff comes together to tell us that the Gulf of Maine is a unit as far as lobsters are concerned, and the lobsters that I catch.  I lost lobsters overboard, a crate breaks, when I had it on the mooring, they always went West.  We found out our V-notch went West.  We found out our oversides went West.  [Our] oversides were caught off the Cape.

An offshore [Lobsterman] – we couldn't find anything out about V-notch lobsters, they disappeared. Well finally an offshore guy came and he said, "You come and I'll show you."  There is a little trench inside, I think it is between Jeffries,  I have to look at a chart, but anyway, if you look at the chart, there is a little funnel out there off of Massachusetts.  He took us off and he said, "Look, I will show you."  His [traps] were full of our V-notch lobsters and some of our tagged ones.

Those lobsters go down to the Cape, they swim and they go out to the inside of the [Georges] and they all funnel back in toward the coast of Maine.  I caught in News River Cove, I caught a lobster that Stevie Robbin's tagged on Truckton's Swell.

You are looking at one stock.  So to be sitting here and drawing these crazy lines that lobsters don't know anything about it.

I assume that you are here to manage lobsters and do something to protect the lobster. . . .

So Maine has been protecting their oversized and there are other people who have been living off of our

laws, and I think that with the pressure going on in this industry today, that we need to draw some [lines] that make sense for the lobsters and protect the lobsters, and let the fishermen figure out how to live with the protected species; because there is too much effort out there.

(R. at 4970-71.) Willis Spear, a Maine commercial fisherman, stated: "I sat at a hearing in Maine and listened to the comments about the line, and where it exists now, and it really doesn't define the Gulf of Maine." (R. at 4971.) He continued: "What Bill said about the lobsters being circulated within the Gulf of Maine, by moving the line down, it helps better define the area in which these lobsters move. . . . By moving this line, it helps better define what we are talking about is the Gulf of Maine . . . ." (Id.) Comments at the September 29 meeting also established that the proposed new boundary line between Areas One and Three was more consistent than the previous thirty-mile line with the boundary lines used for: (1) stock assessment areas (R. at 4971-74); and (2) the management of other fisheries (R. at 4968, 4972).

The minutes of the September 29 meeting also include the following comments directed toward the propriety of the Lobster Board's consideration of a change in the boundary line:

MR ALLEN:  I have kind of a general comment that this issue [shifting the boundary line] brings up, I am just representing myself, but there are a number of places in the document where it says that the Board is seeking public input on the number of areas [within] the specific boundaries.

There are other issues in which it says, "Board is seeking public [input] on issues, but there is no specific proposal.  I am wondering if both, as Board members, you feel that you can take significant and major actions and make changes in the proposals without having offered any specific proposals to the public to comment on.

I would ask you to think of that from your own [conscience] and also I would question whether the administrative procedures act, which I don't really know if the Board operates under the [administrative] procedures act or not, but there was clearly, at the hearing that I attended in Rhode Island, there were people who said, "You have asked us for our [input], but you haven't given us any proposal on which to comment."

I think that most people, if there is not a proposal in the plan, do not focus and come prepared to discuss a proposal, there is no proposal so there is all general ideas.

I would ask for a clarification of whether it is appropriate for the Board to take major action when there was no proposal taken to public hearings.

CHAIRMAN DAVID BORDEN:  The areas were all included as part of a proposal, Dick.  If you're –

MR. ALLEN:  There was never a proposal to change the area.  Most the proposal said, we haven't –

15

CHAIRMAN DAVID [BORDEN]:  Let me - I would clearly reflect that at the Rhode Island hearing, I very clearly stated that the Board was seeking guidance on where the line should be drawn and reconfigured.  I said that at both hearings, so I disagree with you.

MR. ALLEN:  What I am saying is, is that there was no specific proposal to offer the public that would have even made them think about that issue.  I am asking whether it is appropriate to take action on it when no specific proposal was offered to the public.  If [your] answer is yes, it's appropriate, fine.

MR. LOCKHART:  I guess, I don't understand, there was a specific proposal, it is on page 15 of the plan and in the plan summary.  That is the specific proposal.  Furthermore, at every single hearing, I took two minutes at least aside saying the Board is specifically looking for public comments on whether these lines are appropriate.  They may change them based on pubic comment.

MR. ALLEN:  The people who didn't know there was going to be a change made, would not have come to the public hearing to discuss that point.

MR. LOCKHART:  It said in the public document itself, it also mentions those same things, that there is the possibility of changing their management area.  That was specifically spelled out.

CHAIRMAN DAVID BORDEN:  Other public comments on that?  Yes, sir.  Please identify yourself for the record.

MR. COTE:  Bro Cote, Area 3 Lobsterman.  I think what they said is true, we have worked with these areas for the last four or five years, with proposed areas, as they were put out in the document, and people commented on those lines as they were.  I think they come, either at this point and decide that we are going to change the line, and you are talking quite a large

16

area, that you would be pushing this line out.  I can understand any concern of what they are trying to do and what they are trying to protect their V-notch lobsters or whatever, but a lot of those measures are already in place.

We have protection from V-notch.  The overlap area between Federal and State is going to be a problem no matter where that line is, and I think that this is - I would be surprised to see all of a sudden now we're going to be pushing the line out, when a lot of people are not aware of it, and basically commented on the lines that were in the initial proposal.

(R. at 4969-70.)  Later in the hearing, the following relevant exchange occurred:

MR. DRISCOLL:  I just wanted to ask Ralph what he would think the advisors would think about this.  From what I heard this morning, it was Maine and New Hampshire that was keeping in favor of this, but there were a lot of other people at the table.  Could you give us a read on that?

MR. MALING:  Well up to a certain point, we were all in agreement, and somebody mentioned about they want to extend the line out - Maine wanted to extend the line out.  We had a discussion, but the discussion was mainly about that area being extended up in Maine.

The people from Massachusetts weren't concerned. The people from the southern parts weren't there.  Most of the advisors were from one area.  So, we don't know how anybody else might feel about it.  But it was mainly confined to Bob Nunn and a couple of the other guys from Maine, and I just let the discussion run and I didn't know anything about this when I went into that meeting.

I didn't know there was going to be a new line at all.  So, I was a little taken aback, because I had no idea what we were talking about.  But we resolved it

17

any way.  In order not to hold up the process, they said, we'll go with the old lines and we will work out what the States can work out.  Did you hear it differently?

MR. DRISCOLL:  I thought that is what I heard too. I agree that the lines probably should be moved and if I was going to draw it, it would be on the 42 line and that would be the entire Area 1.  But I think you would have to take that out to a public hearing, and get more comment on it.
I don't think we've had sufficient comment on this line move at this time to do anything about it.

CHAIRMAN DAVID BORDEN:  Jill?

MS. GOLDTHWAIT:  Thank you, Mr. Chairman.  I am a bit confused by the discussion about whether we should be able to talk about changing the line here, because [if] we couldn't talk about changing the line, I'm not sure what the point was of having public hearings in the first place.
The hearings that I attended, there was clear interest and changing the line was presented.  The management plan that we took out, says, these areas are subject to change and the Board is seeking public input in the number of areas and their specific boundaries. That's what we heard.
There have been several proposals made about different places based on hearing testimony as to where that line ought to be.  I think that the current proposal on the table is a good one, and I think as you suggest, Mr. Chairman, that there will be future changes in this line, but simply because there was an agreement made – I don't know how many years ago, about where a line should be, it doesn't mean in my mind that we are confined to that now.  I support the proposal on the [table].

CHAIRMAN DAVID BORDEN:  Okay, other Board discussion?  Anyone else in the audience?  Dick you had your hand up earlier?  Do you still want to speak?

18

MR. ALLEN: The reason I had my hand up earlier, was that I thought that there was some confusion about which line they were talking about comparing the stock assessment areas to the management areas.

There is a long history and a lot of input as to why the line ended up the way it was. As Ralph said, they struck him by surprise. He had no idea this was going to be talked about.

I don't think it is adequate to put a line in a document that says that we are seeking public input on this. Okay, you've got the input, if you want to make a proposal, go back to public hearings with a specific proposal, let people know what you are talking about changing. I think that is the responsible way to do it.

I think you are going to lose a tremendous amount of credibility by doing things in this way. I urge you to table this, make a proposal for the future, and go out to public hearings with it.

But just to do it this way, is a travesty as far as I am concerned.

(R. at 4974-75.) Immediately after Mr. Allen made the comment quoted above, the Lobster Board approved, by vote, a motion made by John Nelson, of New Hampshire, to adopt the redrawn boundary between Areas One and Three as a part of Amendment #3 to the ISFMP.

Before Amendment #3 attained any legal significance, it went through the federal rulemaking process. As part of that process, NMFS conducted an environmental review, which resulted in a 165-page FINAL Environmental Impact Statement (FEIS) and Regulatory

19

Impact Review.  That document was dated May 10, 1999, and titled

"FEDERAL LOBSTER MANAGEMENT IN THE EXCLUSIVE ECONOMIC ZONE."

(See R. at 1947-2115)  Among other things, the FEIS states: "NMFS

will adopt the boundaries of the lobster management areas

specified in the Commission's ISFMP."  (R. at 1965.)

At the outset of the review process that led to the FEIS,

NMFS sent a copy of its Draft Environmental Impact Statement

("DEIS"), dated March 17, 1998, to Nick Jenkins, of Shafmaster

Fishing Co. (R. at 1366), which is associated with Little Bay and

also represents seven offshore lobster boats (see R. at 2476).

The DEIS contained six management alternatives for the

trap/pot fishery.  Alternative 2, which became the preferred

alternative in the FEIS, recommended the adoption of Amendment #3

to the ISFMP, and was the only one of the six alternatives to

include the new boundary line between Areas One and Three.  (R.

at 1280-83.)  Alternative 1 retained the old boundary line, set

at thirty miles from shore, and maintained the status quo.  (R.

at 1279-80.)  Alternatives 3 (R. at 1284-97), 4 (R. at 1297-

1300), and 5 (R. at 1300-02) all involved three lobster fishing

zones, with the nearshore zone extending out to thirty miles, the offshore zone beginning at forty miles from shore, and a ten-mile wide buffer zone between the nearshore and offshore fishing zones. Alternative 6 (R. at 1302-03) included no fishing zones at all, because it proposed a complete ban on lobster fishing until such time as the lobster stock recovers from overfishing.

Jenkins, of Shafmaster Fishing Co., responded to the DEIS, in a letter dated April 13, 1998. (R. at 2476-77.) Comments on the DEIS were also submitted by Will Bland, Operations Manager of Little Bay and Shafmaster Fishing Co. (R. at 2484-88). With respect to the boundary line, Bland stated:

> . . . I would like to comment on certain areas of the proposal that are of concern to us as a company. Our first and foremost concern is with the location of the boundary between Area One and Area Three along the coast of Maine. We are adamantly opposed to the relocation of this line as proposed in the ASMFC's Amendment Three. To arbitrarily move this line seaward into the traditional fishing grounds of the offshore fleet without their prior knowledge or input is deemed a threat and contradictory to the process of democratic consensus building, a procedure that is a must if we are to survive as an industry. It does seem curious to me that of all the Area boundary lines in the zone management plan why this one alone was relocated. We were pleased to see, however, that in the DEIS this boundary line was returned to the 44400 loran line, the

location established by industry _consensus_ during the
EMT process.

(R. at 2487.)


Both the DEIS (R. at 1363) and the FEIS (R. at 2055) were
sent to Paul Howard, Executive Director of NEFMC.  NEFMC
submitted a written response (R. at 3038-43), portions of which
were incorporated into the FEIS (R. at 2107, 2110, 2114).


In total, NMFS collected several hundred written comments on
Amendment #3 to the ISFMP, in association with the EIS process,
which fall into sixty-seven basic categories.  (_See_ R. at 2106-
15.)  Public comments, and NMFS responses, relevant to the
questions before the court, are as follows:

> 1.  Comment:  Two U.S. Senators, the Atlantic
> States Marine Fisheries Commission, four state fishery
> agencies, one Maine state senator, six fishing industry
> associations, and twenty three individuals felt the
> National Marine Fisheries Service should adopt a plan
> and regulations that are consistent and complementary
> with the Atlantic States Marine Fisheries Commission
> Plan.
> Response:  NMFS agrees.  The proposed regulations
> are designed to be compatible with the effective
> implementation of the Commission's Amendment No. 3 to
> the American Lobster Interstate Fishery Management Plan
> (ISFMP) and also consistent with the national standards

22

set forth in section 301 of the Magnuson-Stevens Act, in accordance with ACFCMA.

. . .

4.  Comment:  Three state fishery agencies, three fishing industry associations, and fourteen individuals felt NMFS did not comply with National Standard #2 by not using the best available science when drafting the Environmental Impact Statement.

Response:  NMFS disagrees.  See response to comment 2 [which cites NMFS's reliance on the "22nd Northeast Regional Stock Assessment Workshop Document 96-13, dated September 1996"].  The Commission, in consultation with NMFS has scheduled a peer review to update the stock assessment of American lobster during summer 1999.  NMFS will continue consultation with the Commission, to formulate management actions on the basis of the best available scientific information.

. . .

27.  Comment:  The New England Fishery Management Council, the Atlantic States Marine Fisheries Commission, one state fishery agency, and two individuals support historic participation in selected management areas.

Response:  Historic participation in several lobster management areas was proposed by the respective lobster conservation management teams under the ISFMP. The Commission has scheduled hearings during April-May 1999 to receive public comments on this and other facets of management on an area by area basis.  NMFS supports this industry-wide evaluation by the Commission on the merits of historical participation which will facilitate effective coordination between state and Federal management of American lobster throughout the range of the resource.

28.  Comment:  One environmental group, and fourteen individuals supported the use of historic participation and historic trap allocations when

determining where a lobsterman is allowed to fish and how much trap gear an individual may have on the water at any one time.
     Response:  See response to comment 27.

. . .

     53.  Comment:  Three individuals objected to the boundary between Area 1 and Area 3 lobster management areas which moved the line farther offshore from the Area 1/Area 3 boundary line identified by the New England Fishery Management Council and implemented in Amendment #5 to the Federal FMP compared to the Area 1/Area 3 boundary line approved under the Commission's ISFMP Amendment #3.
     Response:  NMFS has accepted the boundary lines recommended by the Commission and its member states under the ISFMP.

. . .

     61.  Comment:  Two state fishery agencies supported implementation of lobster management area lines in Federal waters as specified in the Commission's ISFMP Amendment #3.
     Response:  NMFS agrees and will implement this recommendation.

(R. at 2106-14.)


     NMFS also held thirteen public hearings on the DEIS, including one in Portsmouth, New Hampshire on May 5, 1998.  (R. at 2061-62.)  That hearing was attended by thirty-seven people, nine of whom made oral comments.  (R. at 2080-84.)  While there is no record of any speaker specifically objecting to the

24

boundary between Areas One and Three, two speakers are characterized as not supporting the fishing zones (R. at 2084), while one is characterized as supporting the fishing zones (id.).

In addition to collecting public comments during the EIS process, NMFS also solicited public comments on its proposal for 50 C.F.R. § 697 (based upon Amendment #3 to the ISFMP) as a part of the federal rulemaking process. "NMFS received hundreds of written comments on the American Lobster proposed rule [50 C.F.R. § 697] during the public comment period, which ran from January 11 – February 26, 1999," (R. at 2323 (64 Fed. Reg. 68,231 (Dec. 6, 1999))), including comments from Will Bland of Little Bay (R. at 3356-57) and Nick Jenkins of Shafmaster Fleet Services (R. at 3360-61). NMFS's summary of the comments relevant to the matter before the court include the following:

> *Comment 10:* Several commentators stated that there is no accurate up-to-date stock assessment or industry information (e.g., landings data, fishing effort) upon which to base management decisions.
> *Response:* NMFS disagrees. See response to Comment 6 [citing NMFS's reliance upon the 22nd Northeast Regional Stock Assessment Workshop Document 96-13, dated September 1996 for its determination that the American lobster is overfished]. The next stock assessment, as well as a peer review of that assessment, has been scheduled by the Commission to

25

take place during the Fall 1999.  The conclusion that American lobster is overfished is based upon the best available scientific information, as required by the ACFCMA.  NMFS agrees, however, that statistics on landings and fishing effort should be improved to better characterize the resource and the lobster fishery, for example, through increased sea sampling and mandatory reporting at the vessel and dealer level on a trip-by-trip basis.  The associated requirements for such a program to monitor the eventual success of fishery management measures are being developed under the auspices of the State/Federal Atlantic Coastal Cooperative Statistics Program (ACCSP).

. . .

*Comment 14:*  Fifteen commentators supported the use of historic participation and historic trap allocations when determining where a lobsterman is allowed to fish and how much trap gear an individual may have in the water at any one time.
*Response:*  Industry-wide evaluation of lobster management area plans and management alternatives, including historic participation, is being coordinated through the Commission's adaptive management procedures.  See Response for Comment 2.

. . .

*Comment 40:*  Several commentators objected to the boundary line between Area 1 and Area 3 lobster management areas that occurs farther offshore from the line approved under the American Lobster FMP.
*Response:*  Designation of the boundary line as currently defined reflects the current consensus, in collaboration with the lobster industry, as referenced in Amendment 3 to the American Lobster ISFMP.

. . .

*Comment 42:*  Six commentators proposed that the entire Gulf of Maine north of 42° should be one

management area, primarily to ensure enforcement of the 5 inch (12.7 cm) maximum carapace size prohibition in the offshore areas of the Gulf of Maine.

*Response:* This suggestion would not be compatible with the lobster area designations, and associated boundary lines, recommended by the Commission and its member states under Amendment 3 to the ISFMP. The waters north of 42° encompass separated portions of Lobster Management Area 1, the Outer Cape Management Area, and Lobster Management Area 3.

. . .

*Comment 44:* One commentator felt that the entire offshore management area 3 should be closed to the harvest of American lobster to protect the population of large lobsters which may replenish the nearshore areas with larval and juvenile lobsters.

*Response:* NMFS is aware of no compelling information which would justify closure of the Area 3 fishery to attain ISFMP objectives. In the absence of this information, such an action would not be based on the best scientific information available and would not be fair and equitable to the offshore EEZ industry sector. Geographical and seasonal closures of management areas or portions thereof, are a possible regulatory measure which may be potentially considered under the adaptive management provisions of the ISFMP.

. . .

*Comment 46:* One commentator supported implementation of lobster management area lines in Federal waters, as specified in the Commission's lobster ISFMP Amendment 3.

*Response:* The final rule implements the lobster management areas as specified in Amendment 3 of the ISFMP.

(R. at 2326-30 (64 Fed. Reg. 68,232-36 (Dec. 6, 1999)).)

Against the foregoing factual backdrop, plaintiffs challenge defendant's adoption of the boundary line between management Areas One and Three, codified in 50 C.F.R. § 697.18 (as derived from Amendment #3 to the ISFMP) on three grounds. First, they assert that defendant's decision to adopt the new boundary line violates the Administrative Procedure Act, 7 U.S.C. § 706(2), because:

(a)  There is no evidence anywhere on the record which supports or in any way justifies the need to adopt the boundary line as it is now codified;

(b)  There is no evidence on the record to support a conclusion that the new boundary line meets the requirements of *16 U.S.C. 5103(b)(1(A)* [sic]; and

(c)  The use of the authority granted to the Defendant Secretary under the ACFCMA in the manner in which he did, *inter alia*, the withdrawal of approval of the American Lobster FMP so as to be able to adopt regulations under the ACFCMA, is violative of the purpose and intent of the law.

(Compl. ¶ 34.)  Second, plaintiffs assert that the boundary line was adopted in violation of the Atlantic Coast Fisheries Cooperative Act because the boundary-line rule fails to comply with certain national standards, set out in 16 U.S.C. § 1851, and expanded upon in 50 C.F.R. § 600.305 et seq., relating to: (1) use of the best scientific information available as the basis for

28

management measures (National Standard 2 (or "NS-2"), codified at 16 U.S.C. § 1851(a)(2); <u>see also</u> 50 C.F.R. § 600.315); (2) avoidance of discrimination between residents of different states (National Standard 4 (or "NS-4"), codified at 16 U.S.C. § 1851(a)(4); <u>see also</u> 50 C.F.R. § 600.325); and (3) accounting for the importance of fishery resources to fishing communities (National Standard 8 (or "NS-8"), codified at 16 U.S.C. § 1851(a)(8), <u>see also</u> 50 C.F.R. § 600.345). Third, plaintiffs assert that the boundary-line rule violates the Regulatory Flexibility Act, 7 U.S.C. §§ 604(a)(2) and (5), because defendant has not taken any steps to identify alternatives to the new boundary line and has not taken steps to minimize the significant economic impact imposed on them by the new boundary line.

## Discussion

Both parties have moved for summary judgment on each of the three counts of plaintiffs' complaint. The court considers each count in turn, but begins with a more general discussion of the Administrative Procedure Act.

I.     The APA, Generally

The Administrative Procedure Act is a multi-faceted statute which, among other things: (1) prescribes a process for federal rulemaking, see 5 U.S.C. § 553; (2) requires agencies to conduct regulatory flexibility analyses as part of the rulemaking process, see 5 U.S.C. §§ 601 through 612; and (3) provides for judicial review of agency actions, see 5 U.S.C. §§ 701 through 706.

Generally speaking, the availability of judicial review of an agency action is governed by 5 U.S.C. § 702, which provides, in pertinent part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  For purposes of the APA, a "legal wrong" is "the invasion of a legally protected right." Overseas Media Corp. v. McNamara, 385 F.2d 308, 317 n.15 (D.C. Cir. 1967) (quoting Gonzales v. Freeman, 334 F.2d 570, 575-76 (1964)).

> [T]o be "adversely affected or aggrieved . . . within
> the meaning" of a statute, the plaintiff must establish
> that the injury he complains of (his aggrievement, or
> the adverse effect upon him) falls within the "zone of
> interests" sought to be protected by the statutory

provision whose violation forms the basis for his complaint.  See <u>Clarke v. Securities Industry Assn.</u>, 479 U.S. 388, 396-397 (1987).

<u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 883 (1990) (parallel citations omitted) (emphasis in the original).

When agency action is subject to judicial review, the APA describes the scope of review, in pertinent part, as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall-
>
> . . .
>
> > **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be-
> >
> > > **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > > **(B)** contrary to constitutional right, power, privilege, or immunity;
> > > **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > > **(D)** without observance of procedure required by law;
> > > **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the

> record of an agency hearing provided by
> statute; or
>> **(F)** unwarranted by the facts to the extent
>> that the facts are subject to trial de novo
>> by the reviewing court.
>
> In making the foregoing determinations, the court shall
> review the whole record or those parts of it cited by a
> party, and due account shall be taken of the rule of
> prejudicial error.

5 U.S.C. § 706.


Section 706, standing alone, does not create a substantive right or a cause of action.  See Buckeye Cablevision, Inc. v. United States, 438 F.2d 948, 953 n.2 (6th Cir. 1971) ("Section 10(e) of the Administrative Procedure Act (5 U.S.C. § 706) prescribes the scope of review and remedies available to courts in dealing with administrative agency conduct and does not bestow any substantive rights upon parties to administrative action."); see also Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 457-58 (1999) ("we have long held that this provision [5 U.S.C. § 706] is not an independent grant of subject-matter jurisdiction") (citing Califano v. Sanders, 430 U.S. 99 (1977)). Rather, § 706 merely describes the scope of judicial review when an agency action is properly before the court.  And, as provided

by § 702, judicial review is available only when a party has suffered a legal wrong or has been aggrieved within the meaning of a statute. Thus, the judicial review provisions of the APA are properly invoked by a claim that asserts a legal wrong or aggrievement, based upon some substantive right established outside the judicial review provisions of the APA. When such a claim is asserted, and judicial review is otherwise proper, as per § 702, the scope of that review is governed by § 706.

In this case, Count II asserts that defendant committed multiple violations of the ACFCMA during the course of the rulemaking process, and those assertions provide the basis for plaintiffs' claim of legal wrong or aggrievement within the meaning of a relevant statute. Having alleged a legal wrong, under the substantive law of the ACFCMA, plaintiffs are entitled to judicial review, under § 702, and the scope of that review is provided by § 706. To prevail on such a claim, plaintiffs would have to prove an ACFCMA violation by proving that defendant acted in a manner proscribed by § 706 with respect to fulfilling a legal obligation set out in the ACFCMA. Thus, proof of agency conduct falling within one of the six categories set out in §

33

706(2)(A) through (F), relative to rulemaking under the ACFCMA, will suffice to establish a legal wrong independent of the judicial review provisions of the APA.[6]  Count III mimics Count II; it asserts several violations of the Regulatory Flexibility Act, which are reviewable under § 702, subject to the scope of review described in § 706.  See 5 U.S.C. § 611(a)(1) and (2).

Count I, as asserted by plaintiffs, stands on a different footing from Counts II and III.  In Count I, plaintiffs assert three violations of 5 U.S.C. § 706(2), two of which are essentially freestanding, due to plaintiffs' failure to make any meaningful claim that defendant's arbitrary and capricious action invaded a legal right or violated a statutory provision outside the judicial review provisions of the APA.  Such assertions are insufficient to make out a cause of action, because § 706 confers no substantive rights.  See Buckeye Cablevision, 438 F.2d at 953 n.2 (citation omitted).  In fairness, plaintiffs do also allege an APA violation based upon the lack of evidence in the record

_____

[6] Here, the parties agree that the APA provides the frame of reference for deciding whether defendant's rulemaking has violated the ACFCMA, and, significantly, courts deciding challenges to federal rulemaking under the ACFCMA have reached a similar conclusion.  See, e.g., Ace Lobster, 165 F. Supp. 2d at 163.

demonstrating that the new boundary line meets the requirements of 16 U.S.C. § 5103(b)(1)(A). However, in their motion for summary judgment, plaintiffs appear to abandon any claim based upon § 5103(b)(1)(A); that statute is not mentioned in their discussion of Count I, nor is it mentioned in their discussion of Count II, which addresses violations of two other provisions of § 5103(b)(1). And, in any event, alleging that the record contains no evidence to support a conclusion that the boundary line meets the requirements of § 5103(b)(1)(A), as plaintiffs do, is not the same as alleging that because of faulty administrative practice, defendants promulgated a rule that violates § 5103(b)(1)(A), which is the claim they would have to make.

That said, it would be incorrect to assert that defendant, as a rulemaking agency, is without substantive responsibilities under the APA, nor would it be correct to say that plaintiffs are without substantive rights independent of the judicial review provisions of the APA. Specifically, 5 U.S.C. § 553 prescribes the procedure an administrative agency must follow when adopting regulations. As entities directly affected by NMFS's lobster management regulations, plaintiffs possess a legally enforceable

35

interest in having lobster management regulations adopted in compliance with § 553. While it is not obligated to do so, the court construes plaintiffs' Count I as claiming that defendant failed to carry out his responsibilities under § 553 during the course of promulgating 50 C.F.R. § 697.18. Because plaintiffs claim to have been harmed by defendant's adoption of that regulation, defendant's action qualifies for judicial review under § 702.[7]

Thus, as slightly recast by the court, plaintiffs' complaint consists of three counts, asserting violations of 5 U.S.C. § 553 (Count I), the ACFCMA (Count II), and 5 U.S.C. §§ 603 and 604 (Count III), each of which is subject to judicial review under 5 U.S.C. § 702, the scope of review of which is defined in 5 U.S.C. § 706.

---

[7] In extending the benefit of the doubt, the court acknowledges that it is also granting a second indulgence. In his discussion of Count II, defendant contends, seemingly correctly, that plaintiffs have presented the court with no evidence of economic harm. (Def.'s Mem. Supp. Cross-Mot. Summ. J. at 21.) While defendant's contention could be construed as a challenge to plaintiffs' standing, based upon a failure to allege injury in fact, defendant makes no explicit argument that plaintiffs lack standing, and, for the purposes of ruling on the motions before it, the court assumes that plaintiffs have standing to bring this action.

II.  Plaintiffs' APA Claim

In their motion for summary judgment, plaintiffs argue that defendant's adoption of the new boundary line between lobster management Areas One and Three was arbitrary, capricious, and an abuse of discretion because: (1) the Lobster Board collected insufficient public comment before it and/or the Commission adopted the new boundary as a part of Amendment #3 to the ISFMP;[8] (2) defendant gave what amount to "non-responses" to the public comments raising concerns about the boundary change that were reported in both the FEIS and the Federal Register publication of the final rule; and (3) the administrative record is devoid of any memoranda, e-mails, analysis, or other evidence of deliberation over the proper location of the boundary between Areas One and Three.  Defendant counters that: (1) NMFS is not responsible for any procedural violations allegedly committed by the Lobster Board or the Commission during the course of their consideration of Amendment #3 to the ISFMP; and (2) NMFS acted

---

[8] It would seem that the gravamen of plaintiffs' argument is that the boundary line included in Amendment #3 to the ISFMP was adopted by the Lobster Board, and subsequently by the Commission, without the same kind of collaborative consensus-building process that supported adoption of the "Dick Allen Line" by the New England Fishery Management Council and its inclusion in Amendment #5 to the FMP.  See, e.g., R. at 2487 (Will Bland's written comment on the DEIS, quoted supra).

reasonably in adopting the new boundary line between Areas One and Three. Because plaintiffs appear to concede defendant's first point, with the proviso that the actions of the Lobster Board and the Commission are subject to judicial scrutiny to the extent that NMFS relied upon those actions in making its decision about the disputed boundary line (see Pls.' Reply Mem. at 1), the court turns to the lawfulness of the rulemaking process through which NMFS adopted the new boundary between Areas One and Three.[9]

The rulemaking provisions of the Administrative Procedure Act provide, in pertinent part:

> **(b)** General notice of proposed rule making shall be published in the Federal Register . . .
> **(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without

---

[9] The court notes, at this juncture, that no matter how unhappy plaintiffs may be with the alleged lack of collaborative consensus-building in the process that led to inclusion of the new boundary line in Amendment #3 to the ISFMP, they have cited no legal authority under which either the Lobster Board or the Commission was obligated to engage in such a process. In other words, plaintiffs have identified no support for the proposition that the lack of consensus-building during the process leading to the adoption of Amendment #3 by the Lobster Board and/or the Commission constitutes a legal wrong or an adverse effect within the meaning of a relevant statute. See 5 U.S.C. § 702.

38

> opportunity for oral presentation.  After consideration
> of the relevant matter presented, the agency shall
> incorporate in the rules adopted a concise general
> statement of their basis and purpose.

5 U.S.C. § 553.  Judicial review of an agency's consideration of public comments on a proposed rule is conducted under the "arbitrary and capricious" standard set out in 5 U.S.C. § 706(2)(A) (directing the court to overturn an agency decision that is "arbitrary, capricious, [or] an abuse of discretion"). See, e.g., Reytblatt v. U.S. Nuclear Reg. Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997); County of Los Angeles v. Shalala, 192 F.3d 1005, 1020-21 (D.C. Cir. 1999).

> When applying the "arbitrary and capricious" standard set out in § 706(2)(A), the court

> > presumes the agency action to be valid.  See Citizens
> > to Preserve Overton Park [Inc.] v. Volpe, 401 U.S. 402,
> > 415 (1971); Southern Cal. Edison Co. v. F.E.R.C., 770
> > F.2d 779, 782 (9th Cir. 1985).  Although the court's
> > inquiry is to be searching and careful, the ultimate
> > standard of review for this . . . category [of
> > challenges to agency action] is a narrow one.  See
> > Overton Park, 401 U.S. at 416.

Ace Lobster, 165 F. Supp. 2d at 164 (parallel citations omitted). Under this "highly deferential standard of review," Airport

Impact Relief, Inc. v. Wykle, 192 F.3d 197, 203 (1st Cir. 1999)

(citing Citizens Awareness Network, Inc. v. U.S. Nuclear Reg.

Comm'n, 59 F.3d 284, 290 (1st Cir. 1995)),

> "[t]he task of a court reviewing agency action under
> the APA's 'arbitrary and capricious' standard is to
> determine whether the agency has examined the pertinent
> evidence, considered the relevant factors, and
> 'articulate[d] a satisfactory explanation for its
> action including a rational connection between the
> facts found and the choice made.'" Penobscot Air
> Servs., Ltd. v. Federal Aviation Admin., 164 F.3d 713,
> 719 (1st Cir. 1999) (citing Motor Vehicle Mfrs. Ass'n
> v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43
> (1983) (citation and internal quotation marks
> omitted)).

Airport Impact Relief, 192 F.3d at 202 (parallel citations

omitted).  In other words,

> An agency rule is arbitrary and capricious if the
> agency lacks a rational basis for adopting it - for
> example, if the agency relied on improper factors,
> failed to consider pertinent aspects of the problem,
> offered a rationale contradicting the evidence before
> it, or reached a conclusion so implausible that it
> cannot be attributed to a difference of opinion or the
> application of agency expertise.

Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109

(1st Cir. 1997) (citing Motor Vehicle Mfrs., 463 U.S. at 43; R.I.

Higher Educ. Assist. Auth. v. Sec'y of Educ., 929 F.2d 844, 855

40

(1st Cir. 1991)).  In sum, "[s]o long as the agency's
determination is 'within the bounds of reasoned decisionmaking,'
[the court] may not set it aside, regardless of whether [it] may
have reached an opposite decision."  M/V Cape Ann v. United
States, 199 F.3d 61, 63-64 (1st Cir. 1999) (quoting Baltimore Gas
& Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105-
06 (1983)).

In the context of challenges to a rule promulgated according
to the procedure set out in 5 U.S.C. § 553, the D.C. Circuit
explained:

> Section 553 of the APA requires an agency, after
> notice and comment on a proposed rule, to "incorporate
> in the rules adopted a concise general statement of
> their basis and purpose."  5 U.S.C. § 553(c) (1994).
> Thus, "[t]he basis and purpose statement is
> inextricably intertwined with the receipt of comments."
> Action on Smoking and Health v. CAB, 699 F.2d 1209,
> 1216 (D.C. Cir. 1983) (internal quotation marks and
> footnote omitted).  An agency need not address every
> comment, but it must respond in a reasoned manner to
> those that raise significant problems.  See id.
> Nevertheless, "[t]he detail required in a statement of
> basis and purpose depends on the subject of the
> regulation and the nature of the comments received."
> Id.

Reytblatt, 105 F.3d at 722.  Stated another way:

41

Though a rule may be invalidated under the APA because an agency fails to explain the rule adequately under the "notice and comment" rulemaking requirements,

> [t]here is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.

State of South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir. 1983) (internal citations omitted), cert. denied, 465 U.S. 1080 (1984); see also United Mine Workers of America, Int'l Union v. Dole, 870 F.2d 662, 666 (D.C. Cir. 1989) (regulatory statements "need not be an exhaustive, detailed account of every aspect of the rulemaking proceedings") (internal quotation omitted); Mt. Diablo Hosp. v. Shalala, 3 F.3d 1226, 1234 (9th Cir. 1993). The "keystone" inquiry is whether the Secretary "engaged in reasoned decisionmaking." International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 815 (D.C. Cir. 1983); Mt. Diablo, 3 F.3d at 1234. This court "may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp.[, Inc. v. Arkansas-Best Freight Sys.], 419 U.S. [281,] 286 [(1974)].

County of Los Angeles v. Shalala, 992 F. Supp. 26, 34 (D.D.C. 1998) (rev'd on other grounds, 199 F.3d 1005) (parallel citations omitted).

NMFS did not act in a manner that was arbitrary, capricious, or an abuse of discretion when it adopted the new boundary line between lobster management Areas One and Three. At the outset, the court notes the discrepancy, discussed above, between the way Count I was framed in plaintiffs' complaint and the way in which that count was presented in their motion for summary judgment. That discrepancy, however, is of no moment because the record demonstrates that NMFS's adoption of the new boundary line falls well "within the bounds of reasoned decisionmaking," M/V Cape Ann, 199 F.3d at 63-64.

During the course of a § 553 rulemaking process, the procedural correctness of which plaintiffs do not appear to challenge,[10] public comment was solicited on the proposed lobster

---

[10] More precisely, plaintiffs do not claim, in Count I, that defendant failed to properly publish notice of rulemaking or failed, in any other procedural way, to allow them to participate in the rulemaking process – claims that would, presumably, be reviewed under 5 U.S.C. § 706(2)(D) (the court shall set aside agency actions undertaken "without observance of procedure required by law"). Curiously, however, plaintiffs do argue, with respect to Count II, that defendant adopted the new boundary line "without any type of opportunity by the plaintiffs to comment." (Pls.' Mem. Supp. Mot. Summ. J. at 24.) The court addresses, and rejects, this contention in its discussion of Count II, infra. At this point, however, the court declines to address an argument that plaintiffs have not raised with respect to Count I.

management plan that was eventually adopted by NMFS and codified at 50 C.F.R. § 697. In response to three public comments critical of the proposed boundary change that arose during the EIS process (R. at 2113) and "several" such comments that arose during the § 553 rulemaking process (R. at 2329), NMFS referred to the Commission's approval of Amendment #3 to the ISFMP as the basis for its decision to adopt the new boundary line.

Given that response, plaintiffs contend that "NMFS abdicated its responsibility to consider the boundary during the course of its own rule making and simply adopted the decision of the ASFMC." (Pls. Reply Mem. at 1.) The court concludes, to the contrary, that NMFS relied, appropriately, upon the administrative record generated by the Lobster Board and the Commission, and incorporated the findings made by those bodies, by reference, into its responses to the public comments critical of the new boundary line. The court further notes that plaintiffs cite no legal authority for the proposition that it was inappropriate for NMFS to rely upon the Lobster Board and the Commission in the way that it did.

44

Substantively speaking, the administrative record generated by the work of the Lobster Board and the Commission amply supports a conclusion by NMFS that the new boundary line is an improvement over the old one because it is more consistent with: (1) lobster habitat; (2) boundary lines used to manage other fisheries; and (3) boundary lines used for stock assessment. Based upon NMFS's responses to public comments critical of the new boundary, and the administrative record, the court concludes that by referring to Amendment #3 of the ISFMP, NMFS "examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airport Impact Relief, 192 F.3d at 202 (citations omitted). In other words, NMFS examined the evidence collected by the Lobster Board and the Commission, and, using that evidence, adopted the new boundary line – over several objections – based upon a rational conclusion that the new boundary line creates management areas that: (1) better approximate lobster habitat areas; and (2) facilitate management of the resource by being more consistent with the management areas for other fisheries and the areas used for stock assessment.

45

This case does not involve an agency decision that is arbitrary and capricious due to an inability to discern the basis on which it was made, see County of Los Angeles, 992 F. Supp. at 34 (citation omitted), nor does it involve a rulemaking process in which the rulemaking agency responded to public comment in a manner "simply not supported by the record," County of Los Angeles, 192 F.3d at 1021 (arbitrary and capricious for Secretary to state, in response to public comment, "that there was no evidence of an outlier shortfall" when record showed that Secretary possessed data showing an outlier shortfall).

Finally, for the sake of completeness, the court addresses each of the three reasons advanced by plaintiffs (in their motion for summary judgment) for branding NMFS's adoption of the new boundary line arbitrary and capricious. First, while plaintiffs argue that the Lobster Board collected insufficient public comment before voting to adopt the new boundary, they have cited absolutely no authority to support a claim that the Lobster Board acted unlawfully. And, more to the point, no matter how much or how little public comment the Lobster Board collected, plaintiffs had the opportunity – and availed themselves of it – to submit

comments during the EIS process and the § 553 rulemaking process. Second, for reasons explained above, NMFS did not give "non-responses" to the comments critical of the new boundary line. NMFS was not required to provide "an exhaustive, detailed account of every aspect of the rulemaking proceedings." County of Los Angeles, 992 F. Supp. at 35 (citation omitted). And, in any event, NMFS gave responses that disclosed its awareness of, and reliance on, pertinent evidence. Third, with respect to evidence of deliberation over the location of the boundary line between Areas One and Three, to the extent the record must contain such evidence (a point on which plaintiffs offer no authority) the record generated by the Lobster Board does contain evidence of deliberation on which NMFS was entitled to rely.

Because NMFS's decision to move the boundary line between Areas One and Three was not arbitrary, capricious, or an abuse of discretion, defendant has not violated 7 U.S.C. § 553, and is, therefore, entitled to summary judgment on Count I.

III. <u>Plaintiffs' ACFCMA Claim</u>

Plaintiffs contend, in their complaint, that the new boundary line violates the ACFCMA because it does not meet three separate national standards set out in 16 U.S.C. § 1851(a) and 50 C.F.R. § 600.305 et seq. In their motion for summary judgment, they add a fourth argument – that the new boundary line violates the ACFCMA because NMFS failed to consult with the New England Fishery Management Council, as required by 16 U.S.C. § 5103(b)(1). Defendant contends that NMFS did engage in adequate consultation with NEFMC, and that the new boundary line complies with all three of the national standards cited by plaintiffs. The court agrees.

According to the relevant portion of the Atlantic Coastal Fisheries Cooperative Management Act,

> **(1)** In the absence of an approved and implemented fishery management plan under the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), and after consultation with the appropriate Councils, the Secretary may implement regulations to govern fishing in the exclusive economic zone that are-
>
>> **(A)** compatible with the effective implementation of a coastal fishery management plan; and
>> **(B)** consistent with the national standards set forth in section 301 of the Magnuson-Stevens

> Fishery Conservation and Management Act (16 U.S.C. 1851).

> The regulations may include measures recommended by the Commission to the Secretary that are necessary to support the provisions of the coastal fishery management plan. . . .

16 U.S.C. § 5103(b). According to section 301 of the Magnuson-Stevens Fishery Conservation and Management Act, fishery management plans must comply with a set of ten national standards including the three at issue here. 16 U.S.C. § 1851(a). Specifically, fishery management plans must: (1) be based upon the best available scientific information, § 1851(a)(2); (2) avoid discrimination between residents of different states, § 1851(a)(4); and (3) "take into account the importance of fishery resources to fishing communities," § 1851(a)(8).

The court first considers, under a de novo standard of review, whether NMFS failed adequately to consult the New England Fishery Management Council. See Ace Lobster, 165 F. Supp. 2d at 163-64 (citation omitted). Subsequently, the court turns to each of the three national standards that plaintiffs claim the new boundary line fails to meet, reviewing defendant's actions under the "arbitrary and capricious" standard. See id.

49

A.    Consultation

Plaintiffs appear to concede – as they must – that the administrative record contains evidence that NMFS sent copies of the DEIS, the FEIS, and the proposed rules to the Council and that the Council submitted comments as part of the EIS process and the § 553 rulemaking process.  (See Pls.' Mem. Supp. Mot. Summ. J. at 16-17.)  However, in plaintiffs' view, as supported by various dictionary definitions, § 5103(b)(1) "contemplate[s] more than just mailing a copy of the DEIS or FEIS to the council in order to satisfy the consultation requirement."  (Pls.' Mem. Supp. Mot. Summ. J. at 17.)  In response, and as evidence of consultation, defendant points to: (1) numerous examples of written and oral communication between NMFS and the Council on the subject of lobster management; and (2) NMFS representation on the Council.

Defendant has not violated the consultation requirement of 16 U.S.C. § 5103(b)(1).  While the statute itself does not define the term consultation, and while there is little precedent construing that statutory requirement, the opinion in Ace Lobster, 165 F. Supp. 2d 148, is directly on point.  In that

50

case, which involved a similar challenge to a different aspect of 50 C.F.R. § 697, and exactly the same administrative record at issue here, the district court noted that plaintiffs in that case did "not offer any legal basis for [their] belief" that NMFS did not engage in adequate consultation with the appropriate fishery councils. Id. at 171. As for the level of contact sufficient to satisfy the § 5103(b)(1) consultation requirement, the court found:

> There is evidence that a copy of the FEIS was forwarded to Paul Howard, the Executive Director of the NEFMC and to David R. Kiefer, Executive Director of the MAFMC, Record, 2055, and there is further evidence that "NMFS received several hundred written and oral comments on the American Lobster DEIS during the public comment period" from March 27 through May 19, 1998, some of which were from the NEFMC and the MAFMC. Record, 2060-61. "All of the comments," NMFS states, "were carefully considered." Id. Furthermore, there are five comments on the DEIS authored in part by the NEFMC (Comments 11, 12, 27, 59, and 60, all at Record, 2106-2115) to which NMFS responded directly . . . .

Ace Lobster, 165 F. Supp. 2d at 171. Like the district court in Ace Lobster, this court concludes that "there is sufficient evidence in the Record that NEFMC . . . gave [its] opinions or at least [was] afforded the opportunity by NMFS to give [its] opinions." Id. at 172. Because NEFMC "had adequate

51

opportunities to present [its] views to NMFS," id., "defendant did not exceed his statutory authority by issuing the [disputed] regulation[]," id., and is, therefore, entitled to summary judgment on that portion of Count II asserting a violation of the § 5103(b)(1) consultation requirement.

B.    NS-2: Best Available Scientific Information

Plaintiffs argue that the new boundary line fails to satisfy 16 U.S.C. § 1851(a)(2), National Standard 2, because NMFS has "failed to present any scientific analysis or reasoning to support the adoption of the new boundary between Area 1 and Area 3." (Pls.' Mem. Supp. Mot. Summ. J. at 18.)  Plaintiff also argues, with no factual support whatever, that scientific evidence actually supports returning the boundary line to its old location, because the new boundary opens an additional twenty miles of offshore fishing grounds to the inshore lobster fishing fleet. (Id. at 19.)  Defendant counters by: (1) pointing to several sets of scientific data, identified in the administrative record, on which NMFS based its decision to move the boundary line; and (2) noting that plaintiffs have not identified "any available scientific evidence that NMFS overlooked or failed to

consider in adopting the boundary line" (Def.'s Mem. Supp. Cross-Mot. Summ. J. at 18). The court agrees that NMFS did not adopt the new boundary line in violation of NS-2.

National Standard 2 requires that fishery management plans and the regulations promulgated to implement them "shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

> Scientific information includes, but is not
> limited to, information of a biological, ecological,
> economic, or social nature. . . . If there are
> conflicting facts or opinions relevant to a particular
> point, a Council may choose among them, but should
> justify the choice.

50 C.F.R. § 600.315(b)(1).

The court simply cannot credit plaintiffs' claim that defendant has failed to provide any scientific analysis or reasoning to support adoption of the new boundary. As a preliminary matter, in response to several comments generally questioning the scientific validity of its proposed lobster management rule, submitted during the EIS process and the § 553 rulemaking process, NMFS noted its reliance upon the "22nd

Northeast Regional Stock Assessment Workshop Document 96-13, dated September 1996." (R. at 2106, 2326-27.) More to the point, the minutes of the September 29, 1997, Lobster Board meeting – at which the Board approved the new boundary line – are replete with biological and ecological information related to lobster habitat in the Gulf of Maine. Included in the information the Lobster Board relied on was evidence provided directly by fishermen, some of whom also reported findings from university-sponsored tagging studies, demonstrating that the old boundary line – unlike the new one – ran through the middle of a single lobster habitat, creating a situation in which lobsters too large for fishermen to keep in Area One were likely to migrate across the boundary line into Area Three, where they would not have to be thrown back. The testimony presented at the September 29 Lobster Board meeting falls squarely within the ambit of scientific information, and thus, NMFS's decision to move the boundary line has, at the very least, "some support in the Administrative Record," Parravano v. Babbitt, 837 F. Supp. 1034, 1046 (N.D. Cal. 1993). On the other hand, plaintiffs, who have the burden of proof, and who must overcome the regulation's presumption of validity, see Ace Lobster, 165 F. Supp. 2d at 164

(citation omitted), have identified no conflicting scientific evidence that NMFS either failed to consider, or rejected.

Finally, the court notes that Parravano, on which plaintiffs rely for the proposition that unsupported management decisions violate National Standard 2, actually undermines plaintiffs' position. In Parravano, the court rejected a particular salmon management measure supported by nothing more than "conclusory assertions," 837 F. Supp. at 1046, in the administrative record, but that "was part of a compromise negotiated with the Secretary of the Interior concerning Indian In-River harvest rates," id. at 1047. In ruling that the challenged regulation violated NS-2, the district court explained that "the purpose of the Magnuson Act is to ensure that such compromise decisions are adequately explained and based on the best scientific evidence available – and not simply a matter of political compromise." Id. The irony in plaintiffs' reliance upon Parravano arises from the position they take with respect to Count I, seemingly based upon the argument made on September 29 by Dick Allen, that NMFS's decision to adopt the new boundary was arbitrary and capricious, at least in part, because it was not the product of the same sort of

55

collaborative consensus-building that gave rise to the original Dick Allen Line.  While plaintiffs can point to the political compromises that went into drawing the original Dick Allen Line, they have identified no scientific basis for it.  On the other hand, the administrative record does contain scientific information and reasoning supporting the new location of the boundary line between Areas One and Three.  In sum, it would appear that the decision-making process that plaintiffs would have had NMFS engage in is precisely the process the district court in Parravano found to be arbitrary and capricious.

Because the new location of the boundary line between lobster management areas is supported by scientific evidence upon which NMFS was entitled to rely, and because plaintiffs have identified no scientific evidence that NMFS failed to consider, improperly considered, or rejected, defendant did not act arbitrarily or capriciously with respect to his obligation to base management decisions on the best available scientific information.  Therefore, defendant is entitled to summary judgment on that portion of Count II pertaining to National Standard 2.

56

C.    NS-4: Interstate Discrimination

Plaintiffs argue that the new boundary line fails to satisfy 16 U.S.C. § 1851(a)(4), National Standard 4, "because the impact [of the new boundary line] on New Hampshire fishermen is significantly greater than the impact on Maine fishermen" (Pls.' Mem. Supp. Mot. Summ. J. at 20), and because the administrative record is devoid of any analysis of the three factors that must be met in order to justify the adoption of a fishery management regulation that has differential effects on fishermen from different states.[11]   Defendant contends that the regulation does not violate NS-4 because it is facially neutral, vis à vis state of origin, and because it is justified in terms of the fishery management plan.   The court agrees.

National Standard 4 requires that fishery management plans and the regulations promulgated to implement them

---

[11] Plaintiffs argue, erroneously, and without any citation to authority, that "defendant is required to undertake a careful on-the-record analysis of the conservation, equitable and economic issues involved."  (Pls.' Mem. Supp. Mot. Summ. J. at 22.)  Plaintiffs' position, however, ignores the presumption of validity that attaches to any "interpretation of a statute by the agency charged with administering it," Ace Lobster, 165 F. Supp. 2d at 164 (citations omitted), and attempts, impermissibly, to shift the burden of proof on validity to defendant.

shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1852(a)(4).  As for what constitutes discrimination "among residents of different States," id., the regulations promulgated to implement NS-4 provide, in pertinent part:

> (b) *Discrimination among residents of different states.*  An FMP may not differentiate among U.S. citizens, nationals, resident aliens, or corporations on the basis of their state of residence.  An FMP may not incorporate or rely on a state statute or regulation that discriminates against residents of another state.  Conservation and management measures that have different effects on persons in various geographic locations are permissible if they satisfy the other guidelines under Standard 4.  Examples of these precepts are:
> . . .
> (2) An FMP that closed a spawning ground might disadvantage fishermen living in the state closest to it because they would have to travel farther to an open area, but the closure could be justified under Standard 4 as a conservation measure with no discriminatory intent.

50 C.F.R. § 600.325(b).  The regulations define the term "allocation" in the following way:

An "allocation" or "assignment" of fishing privileges is a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals. Any management measure (or lack of management) has incidental allocative effects, but only those measures that result in <u>direct distributions</u> of fishing privileges will be judged against the allocation requirements of Standard 4. . . . Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type, different quotas or fishing seasons for recreational and commercial fishermen, assignment of ocean areas to different gear users, and limitation of permits to a certain number of vessels or fishermen.

50 C.F.R. § 600.325(c)(1) (emphasis added). In the event that fishing privileges are allocated, the regulation contains definitions and guidance for achieving the statutory mandates of fairness and equity, promotion of conservation, and avoidance of excessive shares. 50 C.F.R. § 600.325(c)(3)(i)-(iii).

While it may be historical fact that New England's offshore lobster fleet is based primarily in New Hampshire, or that New Hampshire lobstermen focus primarily on offshore, i.e., Area Three, fishing grounds, such historical facts are insufficient to overcome the facial neutrality of the disputed regulation. The new boundary line does not discriminate among fishermen based

59

upon their states of residence; it merely determines how extensively various ocean areas may be fished. The boundary-line regulation does not refer to state of residence to determine who may fish, or how intensively one may fish, in any of the various lobster management areas.[12] Accordingly, the regulation is not discriminatory within the meaning of 16 U.S.C. § 1851(a)(4). See, e.g., Ace Lobster, 165 F. Supp. 2d at 179 (uniform trap cap, equally applicable to residents of all states, that affected twenty vessels, eighteen of which were located in Rhode Island, did "not differentiate . . . on the basis of . . . state of residence"); Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987) (regulation adopting amendment to fishery management plan that "discriminate[d] in favor of longline fishermen, who are predominately Alaskan, at the expense

---

[12] If, indeed, the new boundary line harms any identifiable, discrete user group at all – and the record appears to be very thin on the issue of actual harm – the group that has been harmed is not New Hampshire fishermen, but, offshore lobster fishermen. Furthermore, while the FEIS included in the administrative record contains support for the proposition that larger lobster boats typically prosecute the offshore fishery (see, e.g, R. at 1976 ("Trap vessels under 50 feet are usually nearshore vessels, with larger vessels being offshore."); R. at 2017 ("Although not always the case, it is generally recognized that vessels in excess of 50 feet are required to prosecute the offshore fishery."), there is nothing in the boundary-line regulation itself that discriminates against fishermen, with respect to their access to ocean areas, based upon boat size.

of trawlers and pot fishermen, who are predominantly non-Alaskan" did not violate NS-4 because, _inter alia_, "the record indicate[d] that all longliners will benefit, from this regulation, not just the Alaskan longliners"). In short, like the example given in 50 C.F.R. § 600.325(b)(2), the new boundary line is "a conservation measure with no discriminatory intent" that does not violate National Standard 4.

Plaintiffs correctly point out that facially neutral "conservation and management measures that have different effects on persons in different geographic locations" must "satisfy the other guidelines under Standard 4." 50 C.F.R. § 600.325(b). Based upon that requirement, plaintiffs argue, and defendant appears to concede, that the new boundary line is an allocation or assignment of fishing privileges that must satisfy the three conditions described in 50 C.F.R. § 600.325(a)(1)-(3) (and further defined in § 600.325(c)(3)(i)-(iii)). The court, however, is not persuaded that the disputed boundary-line regulation fits the definition of "allocation" set forth in 50 C.F.R. § 600.325(c)(1). Even though sections of 50 C.F.R. § 697 other than the boundary-line provision specify the amount of

61

effort that may be expended in the various lobster management areas, which may create, in conjunction with 50 C.F.R. § 697.18, an "incidental allocative effect[]," the boundary-line regulation itself is not a "direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals" and, as such, is not an allocation. 50 C.F.R. § 600.325(c)(1).[13] Because the disputed regulation is not an allocation, it is not subject to the three requirements set out in 50 C.F.R. § 600.325(a)(1)-(3). Accordingly, there is simply no cause to decide whether 50 C.F.R. § 697.18 is fair and equitable, calculated to promote conservation, or carried out in a way that avoids allowing any entity to acquire excessive privileges, as required by § 600.325(a)(1)-(3).

However, even if the court were bound to consider the three § 600.325(a) factors, defendant would still prevail. Plaintiffs' argument rests upon a claim that defendant has produced no

---

[13] The court further notes that the boundary-line regulation is unlike the regulation at issue in Ace Lobster, which directly distributed the right to fish by specifying trap limits for particular ocean areas. Moreover, the boundary-line regulation bears no resemblance to any of the various allocative mechanisms listed in 50 C.F.R. § 600.325(c)(1).

evidence showing that NMFS conducted an on-the-record analysis of the three factors set out in § 600.325(a)(1)-(3). The APA, however, does not require defendant to prove that NMFS conducted an on-the-record analysis of the three § 600.325(a) factors. It is plaintiffs who must prove that NMFS failed to "examine[] the pertinent evidence, consider the relevant factors, and 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airport Impact Relief, 192 F.3d at 202 (citations omitted).[14]

Finally, even if the § 600.325(a) factors were considered, defendant would still prevail. First, while fairness and equity

_____

[14] As the court has already suggested, plaintiffs' argument impermissibly shifts the burden of proof to defendant, whose regulations enjoy a presumption of validity. In the face of that presumption, plaintiffs cannot simply claim that the administrative record does not contain a discrete point-by-point analysis showing how the new boundary line is fair and equitable, promotes conservation, and avoids granting excessive shares. Rather, plaintiffs bear the burden of proving that NMFS's adoption of the new boundary was arbitrary, capricious, or an abuse of discretion. In order to meet that burden, plaintiffs would have to prove, for example, that defendant examined no evidence whatsoever when adopting the boundary line, or would have to identify a particular piece of pertinent evidence and then prove that NMFS failed to examine it. Plaintiffs, however, simply rely upon their claim that the administrative record contains no explicit analysis of the three § 600.325(a) factors.

63

pertain only to the allocation of fishing privileges, see §
600.325(c)(3)(i), and adoption of the new boundary line does not
constitute an allocation of fishing privileges, the
administrative record nonetheless demonstrates that NMFS did
consider the issue of potential disadvantage to Area Three
offshore lobster fishermen when it explained why it did not
concur with one commentator's suggestion to close Area Three to
lobster fishing (R. at 2329 (64 Fed. Reg. 68,235 (Dec. 6,
1999)).). Specifically, NMFS stated that such a closure "would
not be fair and equitable to the offshore EEZ industry sector"
(id.), which plainly demonstrates that fairness and equity toward
fishermen in plaintiffs' position did enter into NMFS's decision-
making process. Second, for reasons given in the court's
discussion of National Standard 2, the administrative record also
supports a finding that by better approximating lobster habitat
and migration patterns, the new management areas further the
conservation objectives of the ISFMP for lobster. Third, like
the fairness and equity factor, the excessive share factor
applies to allocations of fishing privileges, but unlike the
fairness factor, the excessive share factor cannot be assessed
outside the context of an allocation scheme. Accordingly, were

64

the court properly presented with the question, it would rule that to the extent possible, the new boundary line complies with the three 50 C.F.R. 600.325(a) factors.

Because the undisputed factual record demonstrates that defendant did not act in an arbitrary and capricious manner with respect to his obligation to draft a lobster management plant that does not discriminate against residents of different states, he is entitled to summary judgment on that portion of Count II pertaining to National Standard 4.

D.   NS-8: Impact on Fishing Communities

Plaintiffs argue that the new boundary line also fails to satisfy 16 U.S.C. § 1851(a)(8), National Standard 8, because NMFS unilaterally moved the "boundary line without any type of opportunity by the plaintiffs to comment," thus imposing "significant adverse economic impact without any analysis of this impact having been undertaken by the defendant."  (Pls.' Mem. Supp. Mot. Summ. J. at 24).  More pointedly, plaintiffs contend that "[i]f defendant had conducted even a cursory analysis, it would have discovered that the moving of the boundary line would

have significant effects on the plaintiffs." (Id.) Defendant counters that plaintiffs can point to no evidence, either in the administrative record or subsequently generated, that demonstrates an adverse economic impact on them resulting from adoption of the new boundary line. Defendant further identifies: (1) the range of alternatives it considered with respect to the final rule as a whole (as opposed to just the disputed boundary line); (2) various aspects of the final rule related to the boundary line that are based upon an understanding of the economic value of the lobster fishery to fishing communities; and (3) various economic analyses it undertook during the EIS and rulemaking processes.

National Standard 8 requires that fishery management plans and the regulations promulgated to implement them

> shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). The regulations promulgated to implement NS-8 provide, in pertinent part:

> (b) *General.* (1) This standard requires that an FMP take into account the importance of fishery resources to fishing communities. This consideration, however, is within the context of the conservation requirements of the Magnuson-Stevens Act. Deliberations regarding the importance of fishery resources to affected fishing communities, therefore, must not compromise the achievement of conservation requirements and goals of the FMP. Where the preferred alternative negatively affects the sustained participation of fishing communities, the FMP should discuss the rationale for selecting this alternative over another with a lesser impact on fishing communities. . . .
> (2) This standard does not constitute a basis for allocating resources to a specific fishing community nor for providing preferential treatment based on residence in a fishing community.
> . . .
> (4) The term "sustained participation" means continued access to the fishery within the constraints of the condition of the resource.
> (c) *Analysis.* FMPs must examine the social and economic importance of fisheries to communities potentially affected by management measures.

50 C.F.R. § 600.345.

According to plaintiffs, NMFS's adoption of the new boundary line violates National Standard 8 because defendant did not assess the economic impact of one specific portion of Amendment #3, the new boundary line, to one specific fishing community, the

New Hampshire offshore lobster fishing fleet and those businesses and individuals associated with it.  As a preliminary matter, plaintiffs are flatly incorrect in their claim that NMFS unilaterally moved the boundary line "without any type of opportunity by the plaintiffs to comment."  (Pls.' Mem. Supp. Mot. Summ. J. at 24.)  Plaintiffs had the opportunity to comment on the change at both: (1) the numerous public meetings held by the Lobster Board as it was considering the adoption of Amendment #3 to the lobster ISFMP; and (2) the thirteen public meetings held as a part of the EIS process (see R. at 2061-62), including the May 5, 1998, meeting in Portsmouth, New Hampshire (see R. at 2080-84).  Moreover, plaintiffs did, in fact, submit comments critical of the proposed boundary shift in response to both NMFS's Draft Environmental Impact Statement (see R. at 2474-77, 2484-88) and the proposed rule (see R. at 3355-57, 3376-81).[15]

The court also notes that NMFS did take into account the effect of its new rule on fishing communities.  The DEIS

---

[15] The court is, quite frankly, at a loss to understand how plaintiffs can claim that they were denied the opportunity to comment on the proposed boundary change when their own statement of undisputed facts cites, at ¶ 17, any number of comments submitted by plaintiffs containing objections to the idea of moving the boundary line.

contains: (1) discussions of six management alternatives for the trap/pot lobster fishery, and, for each, a consideration of the social, cultural, and economic impacts (R. at 1279-1304); and (2) a separate discussion of the human activities associated with the lobster fishery (R. at 1316-23). The FEIS contains: (1) analyses of the social, cultural, and economic impacts of the proposed rule as a whole (R. at 1976-80) and in comparison to other alternatives that were rejected (R. at 1980-2001); and (2) a separate discussion of the human activities associated with the lobster fishery (R. at 2007-13). In other words, NMFS collected and analyzed information on community impacts of precisely the sort required by 16 U.S.C. § 1851(a)(8) and 50 C.F.R. § 600.345. See also Ace Lobster, 165 F. Supp. 2d at 182-84 (ruling that 50 C.F.R. § 697.19, the trap limit provision, complies with NS-8).

While defendant concedes that NMFS did not "analyze 'alternatives' to the Commission's recommended Management Area 1/3 boundary line" because it was not feasible to do so (Def.'s Mem. Supp. Cross-Mot. Summ. J. at 21-22), there is no reason why NMFS should have addressed that issue. Unlike, for example, the trap limits specified in 50 C.F.R. § 697.19, which are plainly

69

allocations of fishing privileges, the boundary line, on its own, is not an allocation of fishing privileges.[16]  As such, it cannot have any independent economic effect.[17]  Rather, any economic effect of the boundary-line change will be indirect and contingent and is, at this point, wholly hypothetical.  NMFS was under no obligation to predict, and trace out, the various potential economic effects that might result from decisions that could be made by fishermen in response to the boundary shift.  Furthermore, even if the boundary-line regulation were allocative, plaintiffs cite no authority for the proposition that

_____

[16] Trap limits allocate fishing privileges by allowing people fishing in one area to set more traps than people fishing in another area; those fishing in areas with higher trap limits are privileged to set more gear than those fishing in areas with lower trap limits.  But the boundary line, by itself, allocates nothing, because there is nothing in the regulation that limits access to one side of the boundary or the other on the basis of state of residence, boat length, or any other factor.

[17] To the extent there is an economic impact on those plaintiffs that own lobster boats, with that impact defined as choosing between spending more on fuel to fish beyond fifty miles, with 1800 traps and a large boat, spending less on fuel to fish within the fifty-mile boundary, with 800 traps and a large boat (which, according to plaintiffs, is economically unfeasible (see Pls.' Reply Mem. at 4)), or fishing within the fifty-mile boundary with 800 traps and a smaller boat, those impacts do not result solely from the boundary line, but rather, result from the interaction of the boundary line, the trap limits, and an individual fisherman's own decision as to what kind of boat to fish with and where to set his or her traps.

70

National Standard 8 required NMFS to conduct, and document, an analysis of the potential impacts of each element of the management plan on each potentially impacted fishing community rather than conducting an analysis of the impact of the plan as a whole.[18]

Finally, the court notes that there is nothing in the boundary line itself that has any impact on plaintiffs' sustained participation in the lobster industry. While the new boundary line, in conjunction with trap limits, may limit the economic viability of large steel lobster boats, "'sustained participation' means continued access to the fishery within the constraints of the condition of the resource," 50 C.F.R. § 600.345(b)(4), not continued access within the constraints of economic decisions made by members of the fishing community. In other words, NMFS has an obligation to try to provide for plaintiffs' continued access to the lobster fishery, but it is

---

[18] Moreover, to the extent the regulations specify that NS-8 "does not constitute a basis for allocating resources to a specific fishing community," 50 C.F.R. § 600.345(a)(2), defendant's alleged failure to discover that moving the boundary line would significantly affect plaintiffs' specific fishing community would appear, without more, to be of no moment.

71

not necessarily obligated to try to protect plaintiffs' ability to fish for lobsters from 70-foot steel boats.

Because the undisputed factual record demonstrates that defendant properly took into account the effects of 50 C.F.R. § 697 on fishing communities, he is entitled to summary judgment on that portion of Count II pertaining to National Standard 8.

IV. Plaintiffs' RFA Claim

In their motion for summary judgment, plaintiffs argue that defendant's adoption of the new boundary line between Areas One and Three violates: (1) 5 U.S.C. § 604(a)(2), because defendant failed to analyze and address comments that were submitted in response to the Initial Regulatory Flexibility Analysis ("IRFA"); and (2) § 604(a)(5) because "[n]o analysis was conducted to determine whether an alternative boundary line would have minimized the significant economic impact being dealt to the plaintiffs" (Pls.' Mem. Supp. Mot. Summ. J. at 26 (emphasis added)). Defendant contends that NMFS fully complied with the requirements of the RFA, and produced a Final Regulatory

72

Flexibility Analysis ("FRFA") that meets the standard set out in Associated Fisheries, 127 F.3d at 114.  The court agrees.

"Congress enacted the RFA to encourage administrative agencies to consider the potential impact of nascent federal regulation on small businesses."  Associated Fisheries, 127 F.3d at 111 (citing Pub. L. No. 96-354, § 2(b), 94 Stat. 1164, 1165 (1980) (statement of purpose); Paul R. Verkuil, A Critical Guide to the Regulatory Flexibility Act, 1982 Duke L.J. 213, 215-26 (1982)).  In the statement of purpose that accompanied its adoption of the Regulatory Flexibility Act, Congress found and declared, inter alia:

> **(2)** laws and regulations designed for application to large scale entities have been applied uniformly to small businesses, small organizations, and small governmental jurisdictions even though the problems that gave rise to government action may not have been caused by those smaller entities;
> **(3)** uniform Federal regulatory and reporting requirements have in numerous instances imposed unnecessary and disproportionately burdensome demands including legal, accounting and consulting costs upon small businesses, small organizations, and small governmental jurisdictions with limited resources;
> **(4)** the failure to recognize differences in the scale and resources of regulated entities has in numerous instances adversely affected competition in the marketplace, discouraged innovation and restricted improvements in productivity;

73

Pub. L. No. 96-354, § 2(a), 94 Stat. at 1164.

Based upon the foregoing excerpt from the RFA's statement of purpose, and NMFS's acknowledgment that "all lobster fishers are considered to be small entities under RFA" (R. at 2016), it is not at all clear that the RFA has any applicability to this case. That is, the boundary-line regulation cannot possibly have a disproportionate impact on small entities, <u>vis à vis</u> large-scale entities, because it affects only small entities.[19] And since the regulation affects only small entities, it cannot, as a logical matter, have an effect on plaintiffs that results from their status as small entities, which is the harm the RFA was intended to avoid. On this point, the first circuit has noted that

> the majority of commercial fishing vessels in the
> Northeast are deemed small businesses for purposes of

[19] Since the gravamen of plaintiffs' complaint is that the new boundary line harms them while helping other small entities, rather than helping large-scale entities, it would appear that their RFA claims may be subsumed in their claims, under the ACFCMA, that NMFS violated NS-4 (discouraging interstate discrimination in fishery management plans) and NS-8 (requiring NMFS to account for the impacts of management plans on fishing communities).

74

the RFA. See 5 U.S.C. § 601(3); 13 C.F.R. § 121.601 (1995); see also 61 Fed. Reg. at 27,731 (memorializing the Secretary's recognition of this reality). It follows that any attempt to reduce the adverse economic impacts of a regulation aimed at rebuilding stocks in this fishery is necessarily an attempt to minimize the negative effects of the regulation on small businesses. To that extent, Congress' desire to have agencies write rules that distinguish (where desirable) between big and small businesses has diminished relevance.

Associated Fisheries, 127 F.3d at 115.


Furthermore, plaintiffs do not appear to be claiming that the boundary-line regulation imposes burdensome "legal, accounting and consulting costs," but, rather, that the fifty-mile boundary line may make their fishing businesses less profitable by depriving them of the opportunity to set large numbers of traps, from large steel lobster boats, in areas they were once able to fish in such a manner.[20] It is not apparent, however, that Congress intended the RFA to serve as a basis for

---

[20] In the same way that the fifth circuit observed that the Telecommunications Act of 1996 "does not guarantee all local telephone service providers a sufficient return on investment," Alenco Communications, Inc. v . F.C.C., 201 F.3d 608, 620 (5th Cir. 2000) (emphasis in the original), this court is inclined to believe that while the ACFCMA is protective of the interests of fishing communities, see 16 U.S.C. § 5103(b)(1)(B); 16 U.S.C. § 1851(a)(8), it was not intended to protect the short-term profitability of all possible modes of fishing.

challenges to the substantive content, as opposed to the administrative dimension, of agency regulations. <u>See</u>, <u>e.g.</u>, <u>Alenco</u>, 127 F.3d at 625 ("The RFA is a procedural rather than substantive agency mandate, to be sure . . ."). Nonetheless, and following in the footsteps of the courts that decided <u>Associated Fisheries</u> and <u>Ace Lobster</u>, the court turns to the merits of plaintiffs' RFA claim.

According to that portion of the RFA outlining the requirements for an FRFA:

> When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking . . . the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain-
> . . .
> **(2)** a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
> . . .
> **(5)** a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule, and why each one of the other

significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a). As for the form and content of a Final Regulatory Flexibility Analysis:

Section 604 prescribes the content of an FRFA, but it does not demand a particular mode of presentation. . . . [A]n agency "may incorporate in a regulatory flexibility analysis any data or analysis contained in any other impact statement or analysis required by law," 126 Cong. Rec. at S21,460. Accordingly . . . an agency can satisfy section 604 so long as it complies a meaningful, easily understood analysis that covers each requisite component dictated by the statute and makes the end product – whatever form it reasonably may take – readily available to the public.

Associated Fisheries, 127 F.3d at 115.

Compliance with § 604 is subject to judicial review, the scope of which is defined by 5 U.S.C. § 706. See 5 U.S.C. § 611(a)(2) ("Each court having jurisdiction to review such rule for compliance with section 553 . . . shall have jurisdiction to review any claims of noncompliance with sections 601, 604, 605(b), and 610 in accordance with chapter 7.").

Under the standard enunciated for judicial review of compliance with the RFA, the court reviews only

> whether the agency conducted a complete IRFA and FRFA, in which it described steps to minimize the economic impact of its regulations on small entities and discussed alternatives, providing a reasonable explanation for their rejection. See 5 U.S.C. §§ 603(b)-(c); 604(a)(5); A.M.L. International[, Inc. v. Daley], 107 F. Supp. 2d [90,] 105 [(D. Mass. 2000)]. The court is not asked to make up its own mind about which option seems to it the most efficacious.

Ace Lobster, 165 F. Supp. 2d at 185).  In other words, "courts do not review challenges to the adequacy of an EIS [or an FRFA] under a standard of mathematical exactitude but under a standard of reasonableness."  Associated Fisheries, 127 F.3d at 114 (citations omitted).

Here, as in Ace Lobster, which was based upon the very same administrative record, it

> is clear that defendant complied with the RFA requirements, including both an IRFA in the DEIS and an FRFA in the FEIS, as well as the public comments received from the DEIS and included in the FEIS. Record, 2013-2022.

Ace Lobster, 165 F. Supp. 2d at 185.  Thus, the court's task is to determine whether the contents of the FEIS and the FRFA meet the standards set out in 5 U.S.C. §§ 604(a)(2) and (5).

A.    <u>Response to Public Comments</u>

NMFS adequately summarized and responded to the comments it received on the proposed boundary-line change between Areas One and Three.  As a preliminary matter, to the extent that it does not constitute an allocative measure, for reasons explained above, it is not at all clear that the boundary-line change qualifies as a "significant issue" for purposes of 5 U.S.C. § 604(a)(2).  However, even assuming that the boundary-line change is a significant issue, defendant provided both an adequate summary of the issues raised by the public (a point which plaintiffs do not challenge) and adequate responses.

Plaintiffs argue that NMFS's responses to the various comments related to the boundary-line change are unlawfully "cursory," but they identify no specific comments related to their status as small entities to which NMFS failed to respond. Rather, plaintiffs do little more than restate the argument they made in their APA claim.  Thus, the court can do no better than to restate the analysis it provided in Section II, <u>supra</u>.

Several commentators voiced their opposition to the new boundary line between Areas One and Three.  In response, NMFS indicated that it was adopting the boundary line as set out in Amendment #3.  The administrative record documenting the adoption of Amendment #3 contains a variety of biological, ecological, and scientific explanations for why the new boundary line is more appropriate than the old one for the purpose of lobster conservation.  And, obviously, lobster conservation measures directed toward stock rebuilding are advantageous to all small entities that prosecute the lobster fishery.  See Associated Fisheries, 127 F.3d at 115.  Thus, NMFS responded to public comments on the boundary-line change in a manner that satisfies 5 U.S.C. § 604(a)(2).

B.    Steps to Minimize Impact on Small Entities

Defendant has also met the requirements of 5 U.S.C. § 604(a)(5).  Plaintiffs argue that NMFS failed to conduct an adequate analysis of the economic impact, on them, of the new boundary line.  Their argument seems to be that: (1) they are small entities; (2) NMFS did not conduct an analysis to determine whether alternative regulations might harm them less; and (3)

80

therefore, NMFS failed to properly analyze the impact of the boundary-line regulation on small entities.  To state plaintiffs' argument is to refute it.

First, "section 604 does not require that an FRFA address every alternative, but only that it address significant ones." Associated Fisheries, 127 F.3d at 115 (interpreting former § 604(a)(3), which required "a description of each of the significant alternatives . . . and a statement of the reasons why each one . . . was rejected").  With respect to what constitutes a significant alternative, it seems clear that "significant alternatives" are those with potentially lesser impacts on small entities (versus large-scale entities) as a whole, not those that may lessen the regulatory burden on some particular small entity. Thus, it does not appear that NMFS was obligated, under the RFA, to address management alternatives that might have had lesser impacts on plaintiffs, vis à vis other small entities engaged in lobster fishing.

Second, as to the way in which significant alternatives must be addressed:

> The RFA specifically requires "a statement of the
> factual, policy, and legal reasons for selecting the
> alternative adopted in the final rule." [5 U.S.C. §
> 604(a)(5).] Nowhere does it require, however, cost-
> benefit analysis or economic modeling. Id. Indeed,
> the RFA expressly states that, "[i]n complying with
> [section 604], an agency may provide either a
> quantifiable or numerical description of the effects of
> a proposed rule or alternatives to the proposed rule,
> or more general descriptive statements if
> quantification is not practicable or reliable. 5
> U.S.C. § 607.

Alenco, 201 F.3d at 625 (footnote and citation omitted). Based

upon the foregoing rule, it does not appear that NMFS was

obligated, under the RFA, to conduct an analysis of the economic

effect of the new boundary line on plaintiffs.


Having explained why plaintiffs are not entitled to the sort

of FRFA they seek, the court now turns to the FRFA that NMFS did

provide. NMFS's DEIS set out six alternative management plans

that NMFS was considering for the trap sector of the lobster

fishery. The FEIS presented one of the six, alternative 2, as

the preferred alternative and also discussed each of the five

non-selected alternatives. Each of the six alternatives involved

various combinations of allocative measures, including: a

moratorium on new entrants into the fishery; a prohibition on

82

spearing lobsters; area-specific trap limits and gear

restrictions; a restriction on fishing, during the same trip,

with both traps and non-trap gear.  Only one of the six

alternatives, alternative 2, included the new boundary line

between Areas One and Three.[21]

The FEIS contains a comprehensive FRFA that discusses the

social, cultural, and economic impacts of the preferred

alternative on the lobster fishing industry and that focusses,

individually, on the effects of five specific elements of the

preferred alternative for trap gear: trap caps, maximum trap

sizes, an escape vent size increase, trap tags, and maximum

carapace size.  (R. at 2016-20.)  Because all lobster fishers are

small entities, the FRFA necessarily addresses the impact of the

preferred alternative on small entities.  In addition to

---

[21] Because the boundary line is not an allocative measure, but at most has indirect allocative effects, and because alternative locations for the boundary line might discretely affect individual small entities, but not small entities as a whole, NMFS was under no obligation to single out that specific portion of alternative 2 for special analysis.  Moreover, to the extent that alternative 2 was the only one of the six alternatives to include the new boundary line, NMFS's analysis of the advantages of alternative 2 must, as a logical matter, be counted as an analysis of the advantages of the fifty-mile boundary line over the boundary lines included in the four non-selected alternatives that employed lobster management areas.

discussing the effects of the preferred alternative, in the FRFA, NMFS also discussed the social, cultural, and economic impacts of each of the five non-selected alternatives in the FEIS. And again, because all lobster fishers are small entities, the FEIS necessarily addresses the impacts of the non-preferred alternatives on small entities.

In summary, the court reaches the same conclusion with respect plaintiffs' RFA claims as the district court in Ace Lobster reached on the RFA claims in that case.

> [T]he record reflects that "the Secretary explicitly considered numerous alternatives, exhibited a fair degree of sensitivity concerning the need to alleviate the regulatory burden on small entities within the fishing industry, adopted some salutary measures designed to ease that burden, and satisfactorily explained his reasons for rejecting others."

Ace Lobster, 165 F. Supp. 2d at 186 (quoting Associated Fisheries, 127 F.3d at 116). The RFA asks no more.

Because the undisputed factual record demonstrates that NMFS "made a reasonable, good-faith effort to carry out the mandate of

section 604," <u>Associated Fisheries</u>, 127 F.3d at 114, defendant is entitled to summary Judgment on Count III.

## Conclusion

For the reasons given, plaintiffs' motion for summary judgment (document no. 18) is denied.  Defendant's cross-motion for summary judgment (document no. 21) is granted.  The clerk of court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 16, 2002

cc:  Charles R. Powell, III, Esq.
     Mark A. McSally, Esq.
     Gretchen L. Witt, Esq.
     Kristen L. Gustafson, Esq.